Our final case this morning is No. 23-1910, Long v. Department of Justice. Okay, Mr. Muthra. Good morning, Your Honors. May it please the Court, my name is Tom Muthra. I'm representing Tasha Long, Petitioner in this matter, former case manager with the Bureau of Prisons at MDC Los Angeles. Petitioners position that the MSPB judges and in this case the final decision of the MSPB's decision to sustain the agency's demotion action was an error and that this Court should reverse that error. I have made in my briefing to you two specific arguments as it relates to that. The first one relates to whether or not the agency was able to establish through substantial evidence, as required in the Federal Circuit's cases Loebsch and Harris, that reasonable performance standards were provided to Ms. Long at the beginning of the appraisal period at issue. While most appraisal cases are somewhat, basically apply to one year, this is a little bit different because there's two periods of appraisal that I believe are directly related to Ms. Long's case. In 2020 and 2021 appraisal year, that's a one-year period that spans two calendar years, Ms. Long received a final appraisal. That's provided for in the record at Appendix 151. And in that appraisal, she was given a minimally satisfactory for the work that she performed. The record, unfortunately, is devoid of any evidence of a performance standard being given to Ms. Long, any written evidence of a performance appraisal being given to Ms. Long for the year in which she was demoted, and that would be the 2021 and 2022 appraisal year. There was testimony at hearing from her supervisor that he gave her this performance standard at the beginning of the year. However, there was no evidence presented to this. So at this point, we're left to assume what was contained in the 2021-2022 performance appraisal. Now, I understand in the MSPB judge's decision that he determined that the supervisor's testimony was sufficient enough to establish that these performance standards were given. And so in that regard, we do, while we believe it's learnable and it's questionable as to whether or not or why the agency didn't really able to produce these standards at hearing, we move forward with the additional assumption and the assumption raised by the MSPB judge, because that's where we believe that his error occurred. The performance standards, excuse me, that were given in 2020 and 2021, and as the administrative judge found, were woefully inadequate in and of themselves in what was contained in the documents, woefully inadequate to provide reasonable notice of these performance standards to Ms. Long. Do you contest the notion that performance standards can be given other than in documentary form? I do contest that, sir, in terms of the way in which, in this case, the Bureau of Prisons issued them. We do have the 2020-2021 written performance standards. Those performance standards are issued on an annual basis. That precludes oral performance standards supplementary to that? In terms of, yes, sir, in terms of supplementing and clarifying. What's the authority for that? There is authority, sir, that woefully inadequate performance standards given at the beginning of the year can be clarified through subsequent agency action later on. That's absolutely true, sir, and that's, in fact, the crux of our case, because the administrative judge found… Can the cases say they can be supplemented? They can be clarified, yes, sir. In terms of changed, that's a different question, but they can be, vague standards can be clarified. You review that they weren't clarified sufficiently? That is correct, yes, ma'am. How do we review that? What is the standard of review? It's fairly deferential, right? It is. There's a substantial evidence standard for reviewing those. We believe that the evidence of record in this case was not met. And, in fact, what happened in this case was that the performance standards, rather than being clarified through subsequent action, were, in fact, modified and changed from a forgiving standard that allowed untimely submission of work to an absolute, where untimely no errors could be produced or provided by Ms. Long. And the reason why we reached that conclusion, as outlined in our brief, is the fact that Ms. Long, again, with the assumption that the two-year standards were identical, Ms. Long received a minimally satisfactory rating for 2020 and 2021. The agency went on record formally and indicated that despite performance counseling relating to unsuccessful, or I'm sorry, unacceptable performance relating to timeliness prior to that time, and despite the fact that the performance appraisal in 2020-21 documents consistent untimeliness on her part, the agency still gave her a minimally satisfactory for that period. What the agency was saying is, we don't like unacceptable. We don't like untimely performance. That's clear. There's no dispute about that. Ms. Long was not expecting to get an outstanding performance appraisal or an excellent performance appraisal. But what she got was a minimally satisfactory. In essence, the agency was saying that when you submit untimely work while we don't like it, you can still be minimally satisfactory. And that's exactly the message she took in 2020-2021. Subsequently, the agency issued a performance counseling a month later. And during the rating year of May 2021 in which she was also counseled on untimely performance but indicated in that counseling that her performance was, again, minimally satisfactory. The key that I'm trying to make here is that in order to create an objectively reasonable performance standard, the line has to be drawn somewhere. The employee doesn't get to draw the line. We know that. The agency draws the line. And what the agency was consistently telling Ms. Long throughout this period, until the very end, until the PIP was issued in September, and she was given a very short period of time in which to correct her performance, the agency was indicating that you were performing at a minimally satisfactory level. Your performance would not result in your removal from Federal service or demotion from Federal service. So that was the message that she was taking. This is diametrically opposite to the determination that the administrative judge made, which was that that clarified it and, in fact, helped her understand that she was under an absolute standard for the entire period of time that she was being rated. Well, I'm not sure that I read it as saying that there was an absolute standard in the sense that no errors were permitted. That was the conclusion that the administrative judge reached in his decision. As you read the performance, and again, the only place this is in writing, that actually I... Where did the AHA say that there was an absolute performance standard? Sir, you can turn that. It's page, appendix 23 and appendix page 25. That portion of the initial decision, sir, the administrative judge appears to be indicating that absolute standards are reasonable so long as, and he cites to the Federal Circuit as well as to MSPB case law, they are applied in a reasonable way. So, I mean, we don't have a situation in which she was being fired for a simple mistake, right? Well, she was demoted, sir. But no, the allegations were that she had made multiple. However, the standard is what we're at issue here. We're looking to what was her objectively reasonable criteria. Was it going to be multiple mistakes or was it one mistake? And what the administrative judge interpreted, what I quite frankly interpret is that come the PIP, the performance improvement plan that was issued in September of 2021, she was put on notice for the first time that she could make no mistakes. And that is an onerous task given the fact that up until that point in time, she was allowed. Just to clarify, make no mistakes. You mean complete tasks and meet deadlines. Complete all tasks, meet all deadlines. Correct. So as it was applied and as you read the PIP language, there was no indication of you must do this 99 percent of the time, 95 percent of the time. You must do this period. And there was no indication in the PIP as to when her failure to do that would constitute unacceptable. This is a little bit of a confusing situation because it's an absolute performance standard only in the sense that your goal is to make no mistakes. That's not quite the same thing as saying your performance is unsatisfactory if you make an occasional mistake. And I agree, sir. And if this was given to her at the beginning of the year as part of a performance appraisal where it says in order to have outstanding performance, you must make no mistakes, and identify the different layers and actually explain what it means to have unacceptable behavior. But that wasn't done. That wasn't done according to the judge, according to the clear documents that are in record. So we believe because it was being given as a performance improvement plan, the context is what's most important here. There is a statement saying you are performing at an unacceptable level in order to perform at an acceptable level, not outstanding, not excellent, acceptable, in order to pass this PIP. This is what you have to do and you can't make any mistakes and you can't make any errors. To me, that is an absolute standard, sir. The other aspect of this PIP that I believe was an error, the judge's decision was an error, was finding that the performance improvement plan gave Ms. Long an opportunity to improve after proper notice, a reasonable opportunity to improve after proper notice. And as I've detailed in the brief, the PIP that was chosen was for 30 days. So again, in the context of what's happening, she has been allowed to and been told that untimely work is minimally satisfactory. At a certain point, the agency gets tired of this, maybe rightfully so, and they decide, nope, now we're going to put you on a PIP and we're going to tell you you can't make any mistakes, which is exactly what they did. You can't make any timeliness errors. Where do they say you can't make any mistakes? Sir, I believe it's in the context of the PIP letter itself. And I can... It's at appendix 135. That is where the PIP begins? And what essentially the agency... What does this say on 135, you can't make any mistakes? Yes, sir. And it's a multi-page document, and the first two pages essentially reflect the errors that Ms. Long is alleged to have been making, the performance issues. And you will note that there's only three specific problems identified in element one. Where does it say your performance is unsatisfactory and you can't make any mistakes at all? It says Ms., so on the first page it says, this is a notice your performance is meeting the below listed critical job elements for your position. That doesn't say no mistakes. If you look to what is required of her under the PIP, which is later on in the... It starts on page 137, the tasks identified below are part of the standard duties. Tell us where it says you can't make any mistakes. Okay, so it lists all of these duties, and you go to the bottom. Doesn't it say, like, in this paragraph you identified on 137, it says in the event you miss the program review docket deadline, you shall immediately notify me and provide a written explanation indicating the reason, date of the task will be completed by, and your correction plan. Right? It says, okay, you miss a deadline, tell me why you missed it, tell me when you can provide the work product to me. Yes, I believe if you read further, and if you could tell me where you're reading from here. It's the same paragraph you were looking at on page A137. It's the first full paragraph about midway down, and it starts with in the event. Which I think is, that sentence suggests the opposite of you can make no mistakes. It says, if you fail to meet a deadline, let me know. Let me know why, and let me know when you are going to be able to provide that work product. And I read the sentence that immediately follows that to be the absolute. So in conjunction with that, the next statement is to bring your performance to at least a minimally satisfactory level. You must review and complete the following items by the identified dates. Okay. All right. Thank you. We'll give you two minutes to rebuttal. Yes, sir. Ms. Pizak? Good morning. May it please the Court. So again and again, in these MSBB cases, we have situations where an employee has been disciplined, terminated, or otherwise disciplined. And the employee is given satisfactory, minimally satisfactory ratings during the period when the performance is said to be unsatisfactory. Why is this going on? I mean, it seems like a significant management failure. Well, Your Honor, first let me point you to an illuminating part of the record. And that is the… You're not answering my question. I'm attempting to, Your Honor. I think that the overarching answer to your question is that these tend to be graduated situations, where if you have an initial failing, there is an attempt to have that failing rectified to provide further training, to provide further support, to ensure that it doesn't happen again. And then there is a cumulative effect at some point where the unsuccessful performance needs to be addressed in a more formal way. And I think that's illustrated by the performance elements in this case, one of which I'll point out on Appendix 488. This is the list of the unacceptable aspects, description of what unacceptable means for Element 1 of Ms. Long's performance standards. And one of those aspects of an unacceptable performance is changes or improvements are lacking and monitoring of operations and programs are insufficient. So I think those performance standards demonstrate that there is expected to be improvement. If there is something less than satisfactory, there is expected to be improvement in order to avoid an unsuccessful rating. Less than satisfactory, minimally satisfactory. Yes, Your Honor. And that specific rating is undefined. And the administrative judge explained how one can sort of extrapolate from the explanation of satisfactory and unsatisfactory that there is this middle ground that, in this case, in these standards It just seems problematic to give somebody a minimally satisfactory rating and then tax them for unsatisfactory performance. I would disagree, Your Honor, respectfully. I think there is a difference here between the expectation, which was undisputed that this expectation was conveyed and that Ms. Long was aware of it, that your tasks are to be completed correctly and within the required time frame. Now, that doesn't necessarily mean that every single time you do that, or you fail to do that, you are going to be removed from your position. So there is a continued dialogue between Ms. Long's supervisors and her... It seems to be completely unresponsive to my point. I apologize. It just seems to be a very bad management practice to tell people that their performance is minimally satisfactory and then to tell them it's unsatisfactory because those two things are not consistent. Your Honor, I understand the concern. I think the narrative in that annual review where she was given a minimally satisfactory rating demonstrates the concerns that her supervisors had. They explained in that analysis of the minimally successful activities that she had time management problems, that she needed to meet deadlines, that she needed to conform to agency policy and facility policy in doing these things, and that she wasn't doing that and that needed to be corrected. And then, again, also we have to keep in mind that this is approximately six months. This first review that took place in April 2021 was approximately six months after she became a case manager for the convicted inmate unit. And so it is reasonable that there is this sort of, I don't want to call it a grace period, but a graduated assessment of her capabilities. How much time elapsed between her last annual performance review or some other review and the imposition of the PIP program? Approximately four months. So the review took place in April of 2021 and the PIP was instituted at the end of, I'm sorry, five months, the end of September of 2021. And throughout that period, through the summer, spring and summer of 2021, there are additional instances in her performance log where she was notified that she was performing unacceptably, that there were instances where she failed to complete reports adequately, where she failed to complete them in a timely manner. And so she was very clearly on notice that that type of activity was unacceptable. But they also relied on incidents that occurred before the review, right? I don't know if that's true, Your Honor. I think that there are instances in the record of conduct prior to the performance review that was noted as unacceptable. For the PIP itself, I believe it was focused on the July and August 2021 timeframe in particular. Could we look at the PIP here and see what it said? Sure. And I may very well be wrong about that, Your Honor. So the PIP on 135, it delineates activities that took place on August 31, 2021, August 23, 2021, August 20, August 5, August 30, August 16. So primarily August of 2021. I'm looking at 135 to 136. And when was the performance review? September 28th was the start. Oh, sorry, the performance review was April of 2021. Okay. I also want to point the court's attention. I know, Judge Stoll, you noted the language on page 137 of the PIP discussing what happens if a deadline is not met, that there needs to be some indication of that. There's also further explanation on page 139. Similar language, right? Similar language. It explains that if you miss a deadline, you need to provide a written explanation. It also says on this, and I'm looking at the full paragraph at the bottom of the page in the middle, I will consider your explanations as part of the evaluation process. However, you are on notice that an explanation does not relieve you of the deadline in this letter or the dates established in policy. Failure to meet policy dates provided the required documentation or certifications identified above may result in a failure of this opportunity period. So, again, she was required to provide an explanation if there was a deadline missed, and that explanation would be considered in determining whether or not she had successfully completed the period. And ultimately, there were numerous instances of failures to complete tasks, to complete trainings throughout this just 30-day PIP period that were documented in both the letter recommending her removal and the decision to move on. Were explanations provided? There were explanations, Your Honor. There was a detailed explanation in the proposed removal letter, and that begins on appendix 131. There isn't a lot in the briefing because before this court, Ms. Long is not alleging that she successfully performed the PIP period. The only other point that I'd like to make, unless the court has any additional questions, is that as the first argument made that the standards were not conveyed, as we've argued in the brief, we believe that the standards were extrapolated upon by Ms. Long's supervisors. But there is evidence in the record that the written standards were provided to her in April of 2021, and the fact that it is testimony provided by her supervisor did not undermine the fact that it is evidence and that the administrative judge found that to be substantial evidence and sufficient to support that finding that those standards were provided to her. Unless the court has any further questions, we would ask that the decision board be affirmed. Okay. Thank you, Mrs. Visak. Mr. Muther? Thank you, Your Honor. I just want to make a couple points, and I highlighted that same section of the PIP on appendix page 139 that the counsel pointed out. Again, I will consider your explanations as part of this evaluation process. However, you are on notice, and explanation does not relieve you of the deadlines in this letter or the dates established in the policy. Lotion, the sort of controlling case involving this, specifically talks about this opportunity to have reasonable performance standards communicated at the beginning of the appraisal period. This is the best the agency came up with in September in terms of communicating actual standards, and this was, in my estimation based upon the reading here, was an absolute standard. Prior to this time, it was truly, and as the performance counselings reflect, truly arbitrary based upon an individual supervisor's decision. This untimeliness is minimally satisfactory. This untimeliness is unacceptable with no explanation in the record as to what makes the difference between minimally satisfactory and unacceptable performance. To me, this is the epitome of arbitrariness and what the statute and what this court has said is not appropriate in the federal performance sector or performance appraisal system. Based upon that, we ask again that you reverse the MSPB's decision. Thank you very much. Unless you have other questions. Okay, thank you. Thank you both counsel. The case is submitted. That concludes our session for this morning.